19-1066, Shaffer & Freeman Lakes Environment Conservation Corporation et al. Petitioners versus Federal Energy Regulatory Commission. Mr. Fleming for the petitioners, Ms. Rylander for the respondent, Mr. Heminger for the intervener. Good morning, counsel. Good morning. Please proceed. May it please the court, my name is Robert Petitioners. In a case that unfortunately pits the interest of my clients against the perception that they do not care to protect endangered species of wildlife. So I want to say at the start that that is not the case. What they object to is being forced to bear a burden for protecting wildlife that is not threatened by any act or artifice of man but by forces of nature. So I begin with the two arguments I want to commission before I go on to the Fish and Wildlife Service. First, the commission misinterpreted the Endangered Species Act to give the Fish and Wildlife Service discretion to force a person, in this case Northern Indiana Public Service Company, to provide river flows in what nature would provide. That's the argument we made in our brief. The commission did not respond to that argument and the service does not apparently contest the argument. That is that they don't contend they had the discretion to improve upon nature. They simply contend that what they did mimics nature. But this threshold question, there's very little law. The only case we've been able to find is the Alabama, the Corps of Engineers case, 2006, case from the Northern District of Alabama, that directly addresses the question of whether endangered species mortality resulting from forces of nature is take within the meaning of the Endangered Species Act and that court said it is not. This court should, I believe, clearly state the principle based on the plain language of the Endangered Species Act that it authorized the Fish and Wildlife Service to regulate acts or artifices of man but not acts of nature. Let me ask you, I thought the argument turned, and maybe I'm incorrect, that first you thought FERC erred in deferring to the Fish and Wildlife Service for several reasons and then secondly, that the Fish and Wildlife Services inadequately responded to the expert evidence that your clients submitted. And there were other arguments, but that was the thrust of it, wasn't it? Those are both arguments we make, Your Honor, but right now I'm dealing with what I believe to be a threshold issue and that is because what the Commission said is we don't believe that what Fish and Wildlife Service did was in excess of what nature would provide, but even if we did, even if we did, we hold that the Fish and Wildlife Service has that discretion. Under the law, our position is they have no such discretion and that's the issue I'm addressing. Now, is that a reason why you briefed this case? I'm like Judge Rogers, I'm not quite recognizing that as being where I thought the stress was in this case. I'm sorry? I'm sorry, you're not recognizing your argument as being what you briefed in this case. I'm like Judge Rogers, I thought we were litigating over whether there was error in deferring. Yes, we are, Your Honor, and one reason they deferred was their belief that Fish and Wildlife had the discretion to improve upon nature. And that's... That's probably what they said, even according to your quote that you just gave. They said, that's not what we understand the Fish and Wildlife Service to be doing. Even if they did, but that's a even if. But their upfront holding was that's not what we understand the Fish and Wildlife Service to be doing, so why don't we just take them at their word? Yes, Your Honor, and I'm certainly going to address that. But the only other point I wanted to make about the commission before I move to Fish and Wildlife is that they misinterpreted and misapplied the regulation under the Endangered Species Act that says that a reasonable and prudent measure to avoid incidental take can make only a minor change or minor changes to the proposed agency action. Let me first say what's the same about the staff's alternative proposal and Fish and Wildlife. What's the same is that they both use the same trigger to establish an abnormal flow event, and they both say that generation must cease at both dams as soon as that trigger is reached, so that whatever variance or unevenness in flow might result from generating power goes away during that event. But where they differ is a broad gulf. Since 1925, when Oakdale Dam went into operation, the other upstream dam went in operation two years earlier, so as we speak today, more than 90 years, they've operated in what's generally known as run-of-river mode and maintained constant elevations. That was true before Northern Indiana Public Service bought the project in 1944. It was true before the commission first licensed the project in 2007. But instead of continuing with a run-of-river, as the commission staff said that they believe would best duplicate natural flow conditions, we go through a procedure that the Fish and Wildlife Service imposed that can result in drawdown of Lake Freeman by as much as 12.8 feet. That's in the application. The application acknowledges that that can happen. Lake Freeman is a wide, shallow lake with an average depth of 16 feet, and that kind of drawdown or even lesser drawdowns are significant. I wish I had put this in the joint appendix, but I would refer the court to document number 416 in the commission record at pages 407 through 410. That is a public comment from a marina operator on the lake addressing what happened when there was a drawdown in 2014. The public comment says it was 23 inches. I believe the news reports of the time say 19 inches, and it may be somewhere in that range. And what's important is the comment includes photographs that show what the result of a drawdown of 19 to 23 inches is on the lake. And I will tell you that as of last week, there is another low flow event underway, and the lake is down almost 6 feet. I go through that only to say that a scheme that maintains the elevation as it has been maintained for 95 years is not minorly changed by a scheme that allows the lake to be drawn down as much as 12.8 feet. In no sense, logic, lexicology, or law. So what you would say this case is really about is a minor change? As addressed to the commission, yes, sir. Addressed to this court, you would say there is an error below in defining or applying the requirement of a minor or limitation to a minor change? That's right, your honor. I don't believe that the Fish and Wildlife Service had the authority to impose it, and I don't believe that we don't believe that the commission was required to follow because it's a major change, not a minor change. Now, moving to where the real thrust of our... So just tell me, what rule of law are we supposed to apply? Because here both the commission and the service both concluded, of course, seemingly on its own, that it was not a major change. What is the legal test that you argued below and that you would want us to apply to the difference between major and minor? What did you argue below? How do we know what's major and what's minor in this world? I argued the same thing I'm arguing today, that they are radically opposed views. One not just changes the other, it does away with the other. It completely changes. And look at the language of the regulation, it says... But if you had opposing views, it was an opposition over a relatively small thing. Would it automatically make it minor just because they were in opposition? No, it's... You can't just see that one displaced the other in this opposing views thing. So you have to look at the proposed agency action, which is to maintain the lake level, stop all generation, and then the lakes would remain at the levels that they were when that went into effect and whatever came in to the system would flow out of the system and that would mimic nature. So what standard of review would you say we have to apply in determining whether there is error in the application or definition of the word minor? Your Honor, the word minor is not defined in the regulations. That's not quite right. And it's... So it is a... What standard of review would you say we would apply? De novo, because it's a question of law. De novo is a question of law as to what the bounds are of the application of the word minor? That's correct, Your Honor. And there is so little law on this subject... If it is a question of law, then would you say we have a Chevron standard to apply? I'm still trying to find out what standard we're trying to apply here. If it's a question of law and we don't do that, then no. It's an agency interpretation, then we apply Chevron. And you would decide whether it, given all the certain stances, is a reasonable interpretation and we submit that in no way can it be deemed a reasonable interpretation of the plain language of the regulations. Because? It can't just be that they had oppositional views. So if you could finish that sentence, it's not reasonable because? Because words have meaning. Minor has to mean something. Okay, what does it mean? As opposed to... Yes, I get that it has to mean something. It should be read in the context of the language that precedes it. Cannot change the basic design and other things. Well, the basic design of the proposed agency action is a maintain elevation, run of river program with generation stopped. Well, you change the basic design if you say, no, we're not going to do run of river. We're going to draw down the lake as much as 12.8 feet. Well, if it's all a question of... The difficulty here is it seems a bit of perspective, right? They're going to have to be... They're releasing water already. They're always releasing water. And if under one rule, they release more water than the other, is that changing the fundamental operation? Your Honor, we submit that it is. And I can think of no way that it's logically, lexicologically, or legally, not a major change or more than a minor change when it completely changes the design of the approach. I'm getting... I understand your label here and your genuineness in this argument. I don't question. I'm just trying to understand. We have to write opinions, right? If we were to rule here, we have to write an opinion. We'd have to write an opinion that would say, here's what makes this, in your view, not minor. And I think we've established it can't be that we could go, well, this is just their point of disagreement because that doesn't make it minor by itself. And then you said, well, you kind of re-articulated the same point saying, well, FERC wanted to do run of the river, turn generation off, and the service didn't. But that's just another way of saying that this was the point of disagreement. They had a point of disagreement about this. And I thought we'd already agreed that can't be the definition of minor because points of disagreement can be minor, to borrow a word. And so how do we know that the change in... are being released under one scenario and under the service scenario more than they would under the FERC scenario? So how do we know when an increased release of water becomes a change of the design of the program since they're releasing water to maintain mussels as best they can under both programs or both plans? Yes. Well, the way you tell is that it's not a minor change to take something that's been in place for 95 years and the mussels have lived through it and change it such that it doesn't exist anymore and we have a completely different program. That is, draw down the lake, use the lake for supplemental water. But your honor, I think this will be in more context when I address what the Fish and Wildlife Service did to arrive at their program. So you are saying that, as I understand it then, that looking at the purpose, the ultimate purpose, that that is inconsistent with the text of the regulation. Um, in the sense that it can't be enough that anything that preserves the mussels would be a minor change. I'm not saying that at all. Well, I understand that, but I'm trying to understand how the opinion is written. Because FERC said, same purpose, run a river, but we have to preserve the mussels against incidental take. All right? And you're saying that's not enough. And you're saying text, a few other things. And so I'm trying to translate that. Uh, I mean, what I was trying to understand in this case is, why is it so significant that the lake is treated so differently under the two programs? Um, your honor, this, the phrase in the regulation starts off, it cannot, may change the, I'm not sure the word is major, but the next word is design, and it goes on several other things, and it concludes with, and may make only minor changes. They are different in the design approach, diametrically opposed. So, it is the plain text of the language that I ask you to interpret and believe that you will conclude that it has no meaning at all if this is not a major change instead of a minor change. If, um, if the service plan had said this, because the prior plan said the lake, maintain the lake level within a range of sort of up or down, I guess, three inches either way. That's correct. Okay. And if the service plan had changed that to four inches either way, would that be major or minor? I'm assuming the opposite of minor is major, but maybe that's a mistake. Would that be minor or not? Three inches versus four inches, I would say was minor. Three inches versus as much as 12.8 feet in a current almost six feet is major. And, you know, we as courts just have to then grapple with when do the inches cross the line from not minor into minor. And I'm just trying to come up with a legal rule, not a number. We wouldn't write an opinion saying X inches is too much. Well, as we ask in our brief, there is very little law on this, and these litigants and others in the same position will be well served if the court will give guidance on it. We would be well served. Right. And we're trying to be well served by hearing from you how the opinion would be written, adopting a legal rule, not just saying my client wins. How will we know this one is not minor, but in the next case, when it's a bit different from this, it is minor? By the magnitude, by the fact that it changes the basic design, which is another thing of regulation. It changes the basic design how? Changes the basic design from a run-of-river mode with ceased generation to a we're going to use Lake Freeman for supplemental water to increase. But if the service were to tell me when it gets up that they are using run-of-river mode, you guys have a disagreement about it, but they are continuing to use run-of-river mode. And so then it's not just to maintain mussels at all costs. I don't think they would say that's what they're doing. And it's simply how we ensure the run-of-the-river where the mussels are is maintained. Well, Your Honor, I perhaps got this off rails and would like to move on to why the Forest Services, I mean the Fish and Wildlife Services approximation of natural low flow is not only best available science, but unsupported by substantial evidence. They began by when they encountered mussel mortality downstream of the dam in 2012, assuming that take was caused by Oakdale Dam. They chose to ignore the fact that upstream of both lakes and both dams, mussel conditions were just as bad in terms of low flow, and that mussels there, including threatened rabbit's foot mussels, were dying. Now, if it is happening contemporaneously upstream of this whole project, where nothing can be influenced by lakes or dams, how can they determine that downstream it's because of the dam? Is that an argument you made on re-hearing? I'm sorry? Is that an argument you made on re-hearing before FERC? Yes. You did? Can you state where it is in your re-hearing petition? Well, if not now on rebuttal, I don't want to distract you right now. Okay, I don't have the re-hearing petition right at hand. They then chose linear scaling as the method for low flow, and it is helpful to understand the sequence of events by which that came to be. And I'm going to go through them and give you some joint appendix citations, because a series of emails, the first on October 23, 2013, joint appendix 326. Forrest Clark, who did the linear scaling calculations and appears to have been the primary author of the biological opinion, wrote to a hydrologist at USGS. And said, what I hope to determine is whether or not linear scaling is appropriate to use to extrapolate low flows. It seems it is traditionally used for flood flows. He concluded, forgive the pun, but I'm way out of my depth here and would appreciate any help. Now, you can see his response on joint appendix 327. The hydrologist said that it's problematic to determine low flows or project low flows with linear scaling, and he gave geological reasons why that is the case. Some stretches of river are called losing stretches where river flow runs into groundwater. Some are called gaining stretches where groundwater goes into river flow. Those things don't show up at average or half flows, but they begin to create all kinds of inconsistencies at low flows. So, Mr. Pruitt suggested to his boss on January 31st, 2014, joint appendix 168, that we should consider identifying a service hydrologist to work with us. There is only a little evidence that they ever did that, and I will get to it, but that makes sense because they are trying to make a hydrological decision. They are put in charge of this because they are fish and wildlife biologists, but so far as the record reflects, none of them were hydrologists, and this is a hydrological question. But they did consult with some hydrologists. Yes, Your Honor, I think it would make more sense if I deal with that in order, but they did. This is the first time when they wrote to the guy and asked him about low flow versus high flow. Now, the next three communications took place on the same day, May 13, 2014, and Mr. Clark, again, the Fish and Wildlife Service guy, writes to USGS and said, beginning on 17 August 2010 and continuing through the end of October at least, the discharge at ORA, that's the ORA gauge, consistently larger than at Winnemag, the downstream gauge. Can you provide a reason for this? He wanted to know because that's entirely inconsistent with the theory of linear scaling. The downstream gauge should be higher, but it's consistently lower. He said that early in the morning. The hydrologist responded at 1245 midday, we really don't know the reason, but actual field measurement confirmed that it did happen. Then, a couple of hours later at 249, Mr. Pruitt, who may or may not have seen the hydrologist's response by then, wrote to his boss, purporting to answer this question, does linear scaling apply to the Tippecanoe watershed? Answer, yes. Using linear scaling over the summers between 2002 and 2013, except 2010, resulted in no statistical difference between average daily flow. So, he thinks he has confirmed it by statistical analysis of that data. But later that same day, at 355 p.m., he responds to the hydrologist, Don, thank you. I have to say I was hoping for a different answer, but I'm sure stranger things have happened. At least I know I didn't transcribe it. Oh, well, I'll think about how to deal with this. The point is, earlier that day, he had already dealt with it. He had done the statistical calculations omitting the bothersome data. And he later, some months later, said to one of the engineers at Northern Indiana Public Service, I jettisoned the data from 2010. How many years did that study cover? The study covered 2002 through 2013. So, 11 years, or 12 if you, or 10 if you take out the 2010. That's correct. It's a pretty long study. Yes. And what? And were they told, weren't they told by, I forget whether it was the, I forget who it was that told them, but there was the people that had collected some of the data that were there were problems with the data collection, not with the data itself, but just with the data collection in 2010? That, that appeared 17 months later from the time I'm talking about. He had already. Are you accusing them of lying? Your Honor, I am telling you that that's not the reason they deleted the data. That's the excuse they offered 17 months later. True or not, I cannot say, but it is inconsistent. But they were told by experts that the data, there were problems with that data, with the data collection, sorry, not just the data, not the data per se, but just with the data collection. They were told that there was no quality control done on those two data, and they concluded the data was unreliable. Okay. I want, but here's what they were told by the, here's what I left out, part of what hydrologists, they first contacted. When the 2010 and 2011 water year records were being worked, this item was a real point of discussion. This was the first time we had actual field measurements at the two stations showing less water downstream during a relatively low flow period. And he goes on to outline theories they had, but says, we really don't know, but we do know from actual measurements that it happened. Now, I have to think if it was a matter of great consternation and discussion at USGS at the time that it happened, that if somebody thought the gauges were inaccurate, that would have come up. It didn't come up until four and a half years later. No, excuse me, not quite that, about two years later. So, and it only came up after jettisoning the data was made an issue by the protesters in this case. So, I will say that we know other things where they, there are other, what appear to be intentional misrepresentations on other things, and in determining whether this is reason or excuse, I think the court can take those into account. Excuse me just a moment. We argue that linear scaling is a poor predictor of low flow. And in fact, Dr. Chris, one of the coalition's experts, Joint Appendix 241, cited a published scientific article, peer-reviewed, that said just that and was dealing with the tip of the Canoe River. That is later, years later than the two Galster papers that FWS purports to rely on, and they never mention it. It took historical data and determined that at low flow, linear scaling is a poor predictor. FWS, if they had a reason to ignore that, they never offered it, and they had to know about it because it was brought up in this expert opinion that was provided to them. The Indiana Finance Authority said that linear scaling was biased in favor of overestimating low flows. The commission staff's hydrologist said, I could go on, but I've got it in bullet points in the brief that I was somehow chided about, but the question is not whether it's a difference of opinion, but it's whether there is a difference between a scientifically supported opinion and a non-scientific opinion. Because what does FWS have on the other side? There is no published scientific literature that would support the concept that linear scaling can be used to predict low flows. There is none. We said that. Both of our experts said that. It was argued all along. Nowhere during the proceedings and nowhere in the briefing in this case did Fish and Wildlife ever respond to that. They did bring up some emails that they never put in the Federal Energy Regulatory Commission record and never discussed during the proceedings below about a phone call, phone conversation between Professor Galster, on whom they purport to rely, and the principal author of the linear scaling calculations. We pointed out evidence discovered later that brings into question whether or not Dr. Galster would have said such a thing, as is reported in that email, because he said something completely different later, but be that as it may, they didn't, they had two papers that they didn't deal with low flow. One of them dealt with mean annual flows. One of them dealt with mean flows and flood flows. Neither of them dealt with low flows. And yet, having been told by USGS, having been told by everybody, except purportedly Dr. Galster, that it didn't apply to low flows, they accepted it, I think, because it's what they wanted to hear. They did not say, well, Dr. Galster, if it does apply to low flows, can you give us the citations to where you or someone else has published a paper demonstrating that? Apparently, they didn't have a question. Yes, let me ask you a question, and I'm not suggesting it was your client's burden, but in the two expert opinions that are in the record, both criticize the use of linear scaling. Do they indicate what would have been the proper way for the agency to have proceeded? Yes, they do. And what did they, if you recall, what did they suggest? They suggested that the best way to mimic the natural flow of the river was to do exactly what the commission's staff alternative said to do, which was maintain the lake levels, stop generation. And they did that on the basis, in part, that one, the fish and wildlife didn't have a control measure, namely, what was happening upstream. I don't think, well, one of them certainly cited that and said it was very poor science, not, it demonstrated their lack of scientific rigor, I believe is what he said, but no, that wasn't really the basis. It was that they knew from their own studies and from other published literature that the kinds of flows we're talking about that the Fish and Wildlife Service thought were unusual are common in midwestern rivers of the same size, dammed or undammed, and that there wasn't any need to try to estimate something that you could already achieve just by stopping generation and holding the lake levels. But they had a pretty impressive study that simply stopping generation does not make this flow the same as it would be without the dams there. It's on page 20 of the Fish and Wildlife, it's in many places in the briefing and record, but page 20 of the Fish and Wildlife Service brief, they have a chart there that shows the comparison between how the river would run for the natural flow if there were no dams at all versus these ones with the dams even if no electricity is being generated. So, I mean, you may have a different view, but that was a pretty impressive difference on that chart. That's correct, and that is all based upon their flawed linear scaling exercise. No, this is just for 2012, right? I'm sorry. Tell me the page of the brief again, please. Page 20. This is the Fish and Wildlife Service, the green brief. It's just the reality of the dams being there makes a big difference, even if they're not generating electricity. Well, your honor, I do not believe, it says it does not track, neither the Norway gauge, that's the upstream dam, nor the Oakdale gauge, that's the downstream dam, tracks with the red line measured at the Winnemette gauge. The Winnemette gauge upstream is the one that they use, they say, to calculate what natural flows are. Our expert said, and I'll give you an example. Look, I'm just responding to your point that they couldn't do linear scaling. They were just supposed to take as given that turning off the power generation equals natural flow, and they've got strong evidence regarding that with this chart. Maybe you've got an expert that says, one expert, he said, she said. I am not asking you to decide who is right on that, but I am suggesting that they are saying that everything should be a smooth line, when in fact, that's not the way it works. And an example. Well, no, you said no linear scaling, that's what you opposed, but when Judge Rogers said, what is the method for measuring the river? You said, well, the service's proposal to not lower the lake, that's a result. That's not a way of measuring. It's not linear scaling, then what is the best way for measuring, whether or not, how to maintain natural flow? What is the alternative way of doing that measurement? Not the end result, but the measurement. Well, it is not. The best I can answer to that, Your Honor, and probably may not be sufficient, is that it's not linear scaling. The experts didn't identify how they should do it. They just said, don't bother testing at all. Just keep, just do what the commission wants you to do. Now, there's a false assumption in this chart, that because it's uneven, and it does, one upstream doesn't line up, and that completely with one downstream. Not completely, they're way off. Let's be clear. Understand. And quite frankly, I don't. All right. One can see dramatic contrast between the river's smooth natural flow and the sharp fluctuations in flow from the dams, service made from data from summer of 2012. I have not read that, and without going back to the original document, would believe that that is not with generation stopped. Oh, that's my understanding is that it was. Well. I could be wrong, but that's my understanding. I read somewhere that was with generation stopped. One of us is mistaken, and I don't know who it is. Okay. Well, it could be me. But let me. Maybe the Fish and Wildlife Service can tell us if I've got it wrong here. I don't want to, from the main point, which is the experts didn't propose an alternative way of measuring the river. Well, every expert except Fish and Wildlife Service, that being the one retained by the Indiana Finance Commission, the one retained by the commission, the two that we retained all said that the most natural flow regime is run of river, which means maintaining the lake at a certain level. And let me. Just for your information, on JA1170, where that chart appears, it says generation was not occurring at this time, in the paragraph right under the graph. Then I apologize to the court. I was mistaken. Well, there's a lot of stuff to sort through here, so that's easy to happen. But I can explain to you why those lines would not match up that has nothing to do with unnatural flow. And that is, I would refer you to Joint Appendix 954 through 957. Data that, which lays out data that Fish and Wildlife Service had but ignored. Now, they are trying to take flow above both dams and use it to predict what the flow would be at the downstream dam. And they think it's perfect linear scaling. Well, let's go below the dam and see if perfect linear scaling holds true. In 954, there is the explanation that the behavior between the Oakdale and Delphi gauges, Oakdale is just barely downstream from the dam release, and Delphi is right in the middle of that stretch where the mussels are. For 19 of the 21 days, or July 2012, the flow at Delphi is less than the flow at Oakdale. That violates linear scaling. And that's, and look, that's not being influenced by anything except you let this much water out of the dam and not that much gets downstream. And there are graphs showing this data at the pages that I've referred you to. The river from which the expert concludes the river segment between Oakdale and Delphi is a losing river during this period. Since the Oakdale gauge became operational on 12-13-2008, more than 33% of the time, the flow at Oakdale is greater than the flow at Delphi. On nearly 60% of days in this period for which flows at Oakdale are less than or equal to 600 the stream is losing flow in this stretch, in this reach. So what the assumptions that they made upstream are proven false by the data that they had in 2012 from downstream. And it's just like the first USGS geologist said, complications of geology come into play when you try to use linear scaling to project low flows. And note the trend. Overall, 33% of the time, but when you get below 600, equal to or below 600 CFS at Oakdale Dam, it's 60% of the time that the downstream flow is lower. What's argued here is the same thing happens in the stretch between Winnemette Gauge and Oakdale. Some places are gaining, some are losing. You cannot say that the dam is influencing the flow just because of a figure like the one on page 20 of their brief. That's what this whole discussion is about. And the data, now, they could have looked at that data that he just pointed out about a losing stretch downstream and said, well, here's why we think that doesn't apply. And they might have had a good reason. Instead, they ignored it. Just like they tended to ignore most anything that didn't fit their theory, just like they jettisoned the data from 2010 that was contrary to linear scaling. Um, you, you know, best science has to mean something. And I would like to say what Dr. Chris, one of our experts, said about excluding data. FWS, this is Joint Appendix 243. FWS arbitrarily excluded more than 10% of the available data pairs, specifically 74 points from 2010 when flow at Winnemette was less than at upstream Orem and therefore did not support FWS's hypothesis about linear scaling. Such arbitrary conclusions is word not mine, particularly when representing such a large fraction of the available data that is directly contrary to the claim result is not permitted in statistical analysis and violates the most basic underpinnings of the scientific method. These defects in the data selected by FWS fatally undermine the validity of any conclusions that can be drawn from them. The whole case we're preventing could be summed up by saying FWS in their mission, in their zeal, did a study that determined what flow they needed at Delphi gauge down the stream from Oakdale Dam to, that would be minimally protective of muscles. That's their words. They did that without consideration of whether flows lower than that happen naturally. Then they worked backwards from there to try to show that flows out of Oakdale that would maintain those minimums downstream of Oakdale were natural and in so doing, they chose a scientific support. They misapplied it. They jettisoned relevant data. And if, and all I can say, if that is not an arbitrary and capricious way to go about things, I don't think such thing exists. All right, Council, why don't we hear from Council for FERC and then the Fish and Wildlife Service, and we'll give you some time on rebuttal. Thank you. All right, Council for FERC. May it please the Court, Elizabeth Rylander for the Commission. I'd like to return to the discussion of perspective where we started some time ago now. Schaefer and Freeman points out at pages 25 and 26 of their briefs that their focus here is on the drawdowns of Lake Freeman. And it's very important to note the FERC staff initially agreed with Schaefer and Freeman that the drawdowns weren't needed and that maintaining run of river as FERC defined it would be sufficient to both protect the economic activity at the lake and the endangered mussels downstream. But what's even more important is that the service didn't agree with FERC. And the service found that a different river flow was necessary to protect the endangered mussels. And under the Endangered Species Act, the service's view is what governs here. There are only very narrow circumstances under which FERC does not defer to the service's opinion, and those circumstances aren't presented here. So is the FWS opinion before us for the same kind of review as the rest of the FERC opinion? I'm sorry, Judge Santel. Could you repeat that, please? I guess I maybe didn't make it clear. We review FERC under the usual APA. Now, this includes the decision made by FWS and deferred to by FERC. Yes, Your Honor. Is the service's opinion before us for the same sort of review as the rest of the FERC opinion? Yes, Your Honor, I would say that it is, as discussed in the City of Tacoma case. The presentation is different than it is with regard to biological opinions that are given to some other agencies. But yes, it's on review. Okay, Judith, go ahead. Okay, the commission, the commission... Just to spell it out a little, we're trying to determine whether or not FERC and or the Fish and Wildlife Service were arbitrary and capricious in concluding that a particular drawdown of Lake Freeman was necessary to prevent incidental take because whether or not FERC had any responsibility for examining the Fish and Wildlife reasons for its conclusion. The question is whether the Fish and Wildlife Service considered what was before it and gave an adequate explanation of what it was due under State Farm. Is that your understanding? Yes, it is, Your Honor. And as the commission found here, the two agencies have a difference of opinion in light of their different statutory obligations. And that difference of opinion is not a particular surprise. That's an order of paragraph. FERC learned that the opinion rendered by, let's see, it's the consulting agency, was fine for tracking polar bear climbs and had nothing to do with river flow. Would it still be bound to accept the Fish and Wildlife position? As I read the Supreme Court opinion, there's language in there, well, the FERC rejects the Fish and Wildlife Services position under the Endangered Species Act at its risk. But that case wasn't really dealing with what I pose in this hypothetical. As I understand, Your Honor, you're referring to a biological opinion submitted to FERC on a completely different subject matter outside FERC's jurisdiction and not dealing with the project in question. So even if anyone would say polar bear tracking has absolutely nothing to do with river flow, and to the extent the other agency is relying on polar bear tracking to come up with its proposal, FERC would nevertheless be legally obligated to accept that other position? I'm pressing you because I didn't see the Supreme Court quite to say that, quite to say that. It does so at its risk, but I'm trying to give you a hypothetical of an extreme situation. Yes, Your Honor. City of Tacoma says that blindly adopting the consultant agency's findings isn't acceptable. The commission does have to at least confirm that the findings have some grounding. I would say that if the commission were to have received a biological opinion in this case, where the issue is endangered mussels, and the biological opinion spoke of polar bears, the commission would reasonably have some questions for the service and indeed might not defer. That is, of course, not what happened here. Is that Fish and Wildlife was relying on a model based for overflows that it was alerted to had nothing to do with low flows, and it was problematic. Yes, Your Honor. The commission does not examine the service's substantive findings unless it appears that there is evidence the service did not take into consideration. But don't we have to, if your answer to my first question is correct, then we as a court do have to examine whether there's been arbitrary or superstition made, whether there's been pressure to deal with the major questions raised and comments and the usual things we do in an APA review. Maybe Perkins isn't interested, but since you don't, isn't it incumbent upon us to do so? Yes, Your Honor. It is for the court and not the commission to pass judgment on the adequacy of the biological opinion. The commission— Perkins is taking no position as to the adequacy of the APBA's report. You're just saying Perkins justified in putting aside its own decision and deferring to the differing decision of the service. Yes, Your Honor. Putting aside— It's up to you as to whether the service's decision itself survives APA review, right? Yes, Your Honor. When you answered that FERC has an obligation not to blindly accept what Fish and Wildlife Service has proposed, what is the substance of that obligation? As FERC interpreted that here, FERC examined the biological opinion and found in its orders that biological opinion was thorough and well-reasoned and that Schaefer and Freeman had not presented the commission with any reason to question or to deviate from what the biological opinion said. We had no reason not to defer. Again, all of the evidence that Schaefer and Freeman presented to us, it also presented to the Fish and Wildlife Service and the service was able to consider it all, which gave the commission no basis to do anything other than defer. Let me ask you whether you know, as a practical matter, when these agencies are dealing with each other and the Indiana Public Service Commission was involved, I mean, FERC could pick up the telephone or send an email asking some questions of the Fish and Wildlife Service because it had before it the same record, essentially, that the court now has, including these other two points of view. I will send it, in my hypothetical, you send an email saying, you know, there are two experts here and they're experts in the area that's an issue here and they totally attack your model. What's your response? I mean, FERC could do that, right? Yes, your honor, I think FERC could do that. I think it might do it in writing as opposed to picking up the phone and writing them on the air. But yes, I do think there is room here for interplay between the agencies and certainly there's a lot of written communication back and forth, like following the commission's initial environmental assessment, the service requested more information, the commission provided it. Precisely. Yes. All the emails in this case. I didn't see FERC raise any questions. It got the view and just accepted it. Yes, your honor. Certainly, FERC presented its own views twice and the service responded on both occasions that the service didn't agree. But that's, again, in light of the two agencies' statutory obligations, which are somewhat different, that's not necessarily a surprise. Well, FERC asked for a consultation. All right. So that was an opportunity to explore these questions. Correct? Yes, your honor. Well, can I ask you, at the rehearing stage, FERC receives from petitioners objections to its decision, including some objections to the underlying Fish and Wildlife Service methodologies. And acting on that rehearing petition, does FERC consult with the Fish and Wildlife Service on the biological opinion before acting, or does it ignore those objections? No, I believe FERC is acting just on its own record at that point. I don't believe there's any mechanism at that stage for the commission to interact with the Fish and Wildlife Service. Well, the commission still has the duty to make sure it's behaving reasonably and relying on that biological opinion. And so your position is that they don't at that point? At that point, once problems are raised at the rehearing stage, they can just ignore them and continue to rely on the biological opinion? Rehearing alleges errors in commission's initial order. And at that point, I believe the record is what it is. The commission has some authority to... But the biological opinion is part of that record, correct? Yes, Your Honor. Okay. And so if someone were to say to Judge Rogers' hypothetical on rehearing, FERC, you cannot reasonably rely on this biological opinion because it was predicated on polar bear tracking and not water flow. And your position is that FERC would go, nothing we can do about it. You had noticed that the first time around, now someone's flagged it for you, and FERC would go, nothing we can do about that? It's still reasonable for us to rely on this biological opinion? Oh, no, Your Honor. I think at that point, if the commission had somehow not noticed in its first order that the biological opinion concerned polar bears, then the prudent thing to do would be to grant rehearing and perhaps establish some further agency process. Okay. And what if instead your position said, you've used the wrong water methodology, here's six experts, we showed you six experts, let me remind you to say that methodology is wrong. And FERC says, I hadn't noticed that before. Would it call for rehearing or would it consult the Fish and Wildlife Service and say, did you have a response to this? Or would it look through the biological opinion and see if it addressed it? How does FERC respond to substantive challenges to the Fish and Wildlife Service that aren't as easy as Judge Rogers' hypothetical? But that would nonetheless perhaps make it unreasonable for FERC to rely without further inquiry. At the rehearing stage, Your Honor, FERC is acting under the Federal Power Act, Federal Power Act Section 313. And it does consider what the issues that are raised to it on rehearing, but it does not in the course of considering what to do with a rehearing request to respond to begin further proceedings, as in further consultation with the service, that sort of thing. So to go look at the biological opinion record and to resolve this, to satisfy itself that the Fish and Wildlife Service didn't go astray? You mean the commission loan record, Your Honor? Biological opinion, yes. On these types of issues, that's the only place you're going to in the biological opinion. Yes, Your Honor. The commission would re-examine the record developed before it, including the biological opinion. And if the commission had made errors in its reliance, it could correct them on rehearing. Okay. I would further add in response to the opening argument, there is no rule delineating minor and major changes. The commission did address in both of its orders, the fact that it considered the change in, it considered the operational change here to be a minor one. I did not find that. I see that what FERC was considering was the purpose, the general purpose, that that was the basis on which FERC made its conclusion that this was minor? The commission did speak of general purpose, and it also cited the Westlands case from the Ninth Circuit, which required, and Westlands, which did concern major change, required new additional actions beyond what was contemplated, beyond what had been previously contemplated. This is described as a design change by a petitioner. What do you say to that proposition, when changing the basic design of the program, that this constitutes something more than minor? Your Honor, I'm sorry, I was not able to hear all of your question. I'm going to have to change to a different mic next time we have court. Everybody's having trouble. I apologize. The proposition advanced by the petitioner is that this cannot be dismissed as a minor change, or it changes the fundamental design of the program. What do you say to that? Yes, Your Honor. Both agencies, in addition to sharing the goals of protecting, in addition to sharing the goals of protecting the mussels, were contemplating the best way to obtain run-of-river or natural river flow. It's not designed. The design advanced by FERC involved run-of-river, which was a traditional form of art as to what was going on there, the run-of-river. Yes, Your Honor. The program advanced by the service was not to go with the usual run-of-river, but there would be actual variation in the lake level. Pretty significant, 12 feet on a wide shallow lake. That's a heck of a lot of water. Why isn't that a design change that has to be something more than minor? Again, Your Honor, we're talking about managing river flow by operating a FERC licensed project. In Westlands, there were what was considered more than a minor change to the design of the project involved potentially diverting water from more than one source. What was done in Westland constitutes a major change. That does not speak to whether or not this one is a minor change. I understand, Your Honor. Again, there are very few guideposts in case law. All that is contemplated here is that the licensee would continue to operate the dam, and to operate the dam in order to maintain natural run-of-river flow. That's essentially the same design, and the difference is just in the details. Ah, the devil's in the details. Pretty big difference when you make it 12 feet in the lake level of a wide shallow lake. Many, many acres of heretofore usable lake water that are going down to marshland along the sides instead. Does that not sound something more than minor? Again, Your Honor, I think that brings us back to the discussion of perspective where we started. Certainly from Schaefer and Freeman's perspective, that is more than minor. And initially, the commission thought it was possible to have everything at once. But the commission found, and found again on rehearing, that it is a minor change to what was initially proposed. Did the commission offer any sort of definition as to what minor means in that context? I think we can defer to you on this one, Ron. The commission, in its rehearing order, paragraph 35 and footnote 49, did speak of achieving the same purpose as the commission's staff alternative to approximate run-of-river flow and protect downstream mussel populations, and cited westlands. So, that's not a lot, Your Honor, but that is what the commission has said. Is there a reasonable definition of the term minor to say that anything that is seeking to achieve the same result is not minor? Is that a reasonable definition? I would not want to make representations beyond this case, but in this context, yes, Your Honor, it is. Because? Is your rule just if it advances the same purpose? Because that requires us to think about hypotheticals beyond this case. It advances the same purpose by the same means, which is ensuring natural run-of-river flow. But it's not the same means if you're drawing down a lake more than you were allowing it to be drawn down, significantly more than you were allowing it to be drawn down before. Again, Your Honor, that reflects the difference of opinion between the two agencies, and from the perspective of the Fish and Wildlife Service, I think perhaps that's not a major change. That's not. What about from FERC's perspective? From FERC's perspective, and again, FERC was looking at the means and at the ends. It is not a major change, because what we're doing is directing the river toward protecting. The problem I was having, if you're deciding whether the census is minor or major, can you just look at the beginning and the end, and not look at what's happening in the middle, and determining whether the change itself is what has to be minor to be within these terms? And I don't see that as a way of defining whether a change is major or minor, just to say, well, we're all going to go the same way. We don't write just for a case. We write for precedent as well, and having a definition of minor might be very helpful in getting there, but I don't think there's one in the documentation we're reviewing. Counsel, do you know of any other situation where FERC has had to draw the distinction between major and minor? I do not, Your Honor. I would, however, note that if the question has to do with allowing additional water flow, the commission has done that, and the court has approved it in the Alabama power case cited in our brief, where the species in question was an endangered snail. I remember in Alabama, the company was on the side of the snail. I just have a remedy question. Yes, Your Honor. And that is, if this hypothetical, obviously, but if the court were to define that FERC was reasonable in deferring to the Fish and Wildlife Service's biological opinion, so you're following it was reasonable, but the biological opinion itself is actually flawed, what kind of remedy could be imposed since the only petition for review here is from FERC's licensing decision, which we will have just said FERC acted reasonably in issuing the license and reliance on the Fish and Wildlife Service? I know they object to the biological opinion, but they didn't do a separate petition for review or name. They're not here as a respondent before us, you know, when they intervened, but what kind of remedy would happen in a case like this? We thought FERC got it right in issuing the license, but given the deference that's expected to, not blind deference, but deference that's expected to Fish and Wildlife Service, how does this work? I don't know, Your Honor. There would have to be some further agency proceeding. If FERC was reasonable in deference, and in issuing the license otherwise, and in issuing the license, I would think that the remedy would have to be for further proceedings between FERC and the service. I'm not sure what that would look like. Seems odd not to grant a petition, even though we've found that the agency action, the object of that petition was properly taken and lawfully taken. It does, Your Honor. It does. What would happen in your view? Sorry, I didn't hear. Neither did I. I didn't hear your question, Judge Rogers. What would happen in your view on remand? I would think that FERC and the service would have to revisit their consultation. I'm not aware of instances in which that has happened previously, so I don't want to speculate as to exactly how that would look. If we vacate, or even if we remand for further proceedings, wouldn't there have to be a new hearing, essentially? There would have to be some further- An interagency meeting between FERC and the service, but an open proceeding for the parties. Other parties could be heard again. Yes. If the biological opinion were invalid, I think then we would have to return to the point where FERC requested consultation on the staff alternative and redo the proceeding from there. Going back to the question that Judge Rogers was pursuing, there was not any way, or one of my colleagues was pursuing, there was not any way for the petition to be taken directly from the FWS to the court. No, Your Honor. They filed theirs with FERC, and there's no way at that point that a petitioner can arise, Schaefer can arise to bring it to us. It has to go through FERC, right? Correct, Your Honor. Right. And let me be clear. At the point of rehearing, FERC did not have petitioners' arguments about linear scaling. They did have. FERC did have the arguments about linear scaling. It did not have the arguments concerning upstream muscles, and it did not have some of the very specific arguments concerning who knew what at what time. But it did have, well, it did have the expert, petitioner's experts' views. Yes, Your Honor. FERC had those views, and FERC had the service's opinions on those views. Didn't have the argument about jettisoning the 2010 data. I believe that was, I do not believe that was raised on rehearing. I know I addressed it in my brief, but I don't have the correct page. Or the challenge to the exponents. Correct. What if the official wildlife service intervened here, and what if they hadn't intervened, had not intervened? Then the only question properly before the court would be of reliance. So by their intervention, they imperil their biological opinion, but if they stay out, they don't. They had a lesson to them to stay out. Yes, Your Honor. I think, I mean, the alternative would be that FERC would attempt to defend a technical document that it didn't develop. There are procedures for challenging biological opinions, correct? Yes, Your Honor. Is that normally in district court? I believe with regard to, and I think service's counsel is probably better equipped to answer this question than I am, but I believe under many, in many other circumstances, the biological opinion can be challenged in district court. But when you're dealing with a FERC opinion, they cannot. If it's proceeding to be impossible for a petition to take that direction in court, any court, or does it all have to go through FERC? Judge, until you're referring to... It's probably a final decision. Ordinarily, the APA, they have to enter into the APA, a jurisdiction under the APA. Ordinarily, there has to be a final decision that we would be reviewing. The biological opinion being furnished to another agency as the service entered a final decision that is reviewable under the APA. I would say no, Your Honor, because unless the substance of the biological opinion and the reasonable and prudent measures are incorporated into the FERC license, I don't believe that they would bind the licensee. Nobody has a standing or has a jurisdiction under the APA for us to review the service's opinion at that point. Right. Okay. Thank you. Thank you. Our interim here, Department of Interior, Fish and Wildlife Service. So I'll start by wishing the court good afternoon. Good afternoon. Good afternoon, Your Honor. Justin Heminger at the Justice Department on behalf of the Fish and Wildlife Service The service's biological opinion here for four federally protected mussel species does reflect solid evidentiary support and also sound science. And the petitioner's arguments based on the record are not supported and contradict this court's case law. I did want to cover two basic points today in response to the petitioner's questions from the court about several other things that I'd also like to address. The basic points that I would like to make today are first, that the service reasonably concluded that the operation of the dams under the current license, the 2007 license, would result in harm or death to mussels downstream. And that's what the Endangered Species Act refers to as TAKE. And then the second basic point that I wanted to make today is that the service rationally chose the linear scaling model to model the Tippecanoe's natural flow. I also heard questions from the court about the reasonable and prudent measure and whether that is a major or minor change. And then I also heard Judge Millett referencing the petitioner's failure to identify the service's order as an order that they were challenging under review. And I take it that that question relates to whether the court has jurisdiction to review the service's biological opinion. I'm happy to take those points in order unless the court would like to direct me to a different topic first. So let me ask you, in your brief, you say what is before us is the two orders by FERT and a third agency action, the biological opinion. So did you intend to be cagey? Or what? Your Honor, I think that goes to, we did not intend to be cagey, but we, there is some nuance here. And we take that from the petitioner's position here. So this relates to your brief. You're telling me what rulings are under review? Yes, Your Honor. So are you in the last sentence telling me that is not under review? Your Honor, the way that I would word that, so our sentence in that certificate is to parties. This is Romanat 1 in our certificate says the coalition's brief also seeks to challenge a third agency action. That's what I'm, by cagey. Did you mean it's not before us? I couldn't understand. Well, Your Honor, there's the case law in this court is somewhat, I would say, describe it as fluid. I guess, you know, if I were writing the rule, then I would say that the petitioner is obligated under federal rule of health procedure 15 to identify both the agency and the order that is challenging. And if you were to... Could I just ask you, counsel? Yes, Your Honor. You're representing the Department of Interior Fish and Wildlife Service through the Department of Justice. Correct. Did you argue in your brief that what you described as the third agency order is not properly before this court? Your Honor, on page 49 of our brief, we... Actually, I would say page 48 to 49. We do raise this issue. I will put it that way. We raise it in the context of the petitioner's argument that the Fish and Wildlife Service cannot rely on its own administrative record when defending its biological opinion. And our... But, counsel, isn't that a completely different issue than what I'm asking you? Because then you say, you know, we clarify this distinction in the city of Tacoma. I don't want to spend too much time on this, but it does seem to me if the Department of Justice is saying this is not properly before us, you can say it. I didn't read it that way at all, and I don't know how the petitioners could respond. Fair enough, Your Honor. And this goes to the court's decision, and if the court is satisfied that the order is properly before it, then we're not here to press that argument. We, in fact, we're here to intervene and defend the biological opinion on its own terms. Do you agree? Yes, Your Honor. And I would just point out on page 49 that we cite to the court's decision. There is a lot of case law that, again, sort of is fairly murky on this and suggests that a petitioner can resurrect its challenge to an agency action, but with later filings. And we address some of that, the factual basis for kind of unpacking that in footnote 3. But again, we're here to defend the merits of the biological opinion. I just want to be clear on this, counsel, because whatever we hold, it could be, and then you file a petition for rehearing in bank or a petition for rehearing, saying this was not properly before us. And I want to see where you've made that argument. And when you cite the city of Tacoma, that doesn't tell me that you're making that argument. And when you are raising this issue, it's in the context of whether this additional record could be made part of the court's record, which seems to be a different context. That's all I'm getting at. Your Honor, setting aside my personal views, I would say that the petition to the court has to do with jurisdiction. Are you arguing at all? Because I'm trying to understand if we're going to get a petition for rehearing saying we lack jurisdiction. I didn't see that in your brief. I would agree with that, Your Honor. We have only raised this in passing. In passing? But I would say the court has to assure itself of jurisdiction. Of course we do, but I'd like to know what the Department of Justice thinks. I understand that, Your Honor, and I wish I could provide more assurance on that point. Not entirely unrelated to oral rights and oral goods. If we don't review the if-then-be-if advice as part of the court record, then it's safe to review them. I would agree with that, Judge Santel. Pardon? Yes, Your Honor. Okay, thank you. And do you have a position on, imagine a case where it was a close call, and FERC was utterly reasonable in that close call to rely on the Fish and Wildlife Service's biological opinion, but in examining the biological opinion itself, the close call actually breaks against the service, and it turns out the biological opinion is flawed. What's the remedy? FERC's done nothing wrong. It's done everything right under our opinion. Your Honor, give me a moment. I'm afraid, Mr. Hanging, you're breaking up, so we're having trouble hearing you. I apologize. Is that any better? Could be. A little better. Now and then. So, City of Tacoma does address this point. It talks about the two inquiries, the court's two inquiries overlapping. It doesn't address the remedy issue because they're denied the access to the biological opinion. That's correct, Your Honor, and I do think that the remedy is a tricky issue in this context, but we've argued if the court finds something about the biological opinion that is flawed, then we've argued that the court should remand without vacatur, and in fact, the company intervened and made that point. They're not appearing here to argue, but they made that brief that any remand should be without vacatur. Vacatur or not is determined by the nature of the error, not the preferences of litigants. Well, Your Honor, I wouldn't characterize it as a preference. Their point is, and they're not here to speak to this, but their point is that the Endangered Species Act imposes both criminal and civil liability for take of endangered species, and so without a biological opinion in place, they do face potential liability, and so for those reasons and, you know, again, depending on what sort of an error the court were to find, we would argue that the court should leave the that the court has identified, but that's on remedy. I did want to address the error. On that better explanation, can you help explain the, when things are minor or not, and what the reference point is, because as I read the regulation, the reference point is the basic design, location, scope, duration, and timing of the action, and so that's the reference point, and the action here was FERC's proposal. It's called the staff alternative, but I'm going to call it the FERC proposal. Your Honor, we actually, so I agree with your reference to the regulation, but in our brief, we disagree that the staff proposal is the relevant federal action here. I think it's unclear what you should be comparing the service's biological opinion to, so the petitioners say that it's the FERC staff alternative because that's the solution that they prefer, but if you look at the petitioner's cite to the definition of action, but don't include the entire regulatory text. I can give you the text. I don't believe it is in the addendums, but it's 50 CFR section 402.02, and that defines what the action is, and it defines action as all activities or programs of any kind authorized, funded, or carried out in whole or in part by federal agencies, and then it says, and this is the part that's not in the petitioner's reply brief, examples include, but are not limited to, C, the granting of licenses, so. Well, but I know, but the whole, I mean, it has to be minor as part of what you're reviewing in your biological opinion, and the action you're reviewing in your biological opinion is on the first page, or at least in the introduction, and that is what we're reviewing is the FERC staff alternative. That's what the whole biological opinion is about. The entire biological opinion is about the FERC staff alternative or not. It's not about status quo, and so I don't understand how in deciding whether this reasonable and prudent measure is minor or not, we're not Is it really your position that the action, the comparison point for whether something's minor is not in the biological opinion, is not what the whole biological opinion is about? That's your position across the board. So, a couple responses. First, you have to, are you looking at JA 1155? Is that where, that's the beginning of the biological opinion? JA 867 for me, introduction. This document transmits the biological opinion based on our review of the FERC staff alternative, and then whenever you have this biological opinion, it's all about the FERC staff alternative, and you ultimately include, conclude that the FERC staff alternative, not the status quo, would not jeopardize the species, but the FERC staff alternative would result in a take unless the FERC staff alternative is adjusted by these reasonable and prudent measures. Yet, then when you say whether that reasonable and prudent measure is minor, pay no attention to the FERC staff alternative. That can't be right. Fair enough, Your Honor. So, I think more importantly when you're looking at the regulation itself, this is, and I did want to, in this context, address Judge Santel's questions about whether we apply deference or not. We don't think there's any deference required here, because we are talking about, this is a regulation. This is not a deference. I want to apply deference. Go ahead. So, the regulation- What deference the court applies on the definition, or what- Correct, Your Honor. Correct, Your Honor. So, the service did not interpret, this is a regulation that the service developed, the Endangered Species Act regulation on major versus minor changes, but the service did not offer some sort of interpretation that we would seek our or Kaiser or Chevron deference on. It's simply that we're only looking at the plain language here of this about the basic scope, design, duration. Correct, but the court can apply its own understanding of the word minor and its own applicability to this case without claiming any deference. Yes, Your Honor. And so, what I would say is, I think it's helpful, actually, to go back to the beginning of this license. So, this license that FERC issued included two articles that are relevant here. One is Article 403, and the other is Article 405. Article 403, FERC generally established that the lakes, that the reservoirs would be maintained within plus or minus three inches of a particular design level. And in that context, FERC was referring to that as run of river. But when FERC issued the license, it recognized that, in fact, this equipment that dams had was outdated. It was hydropower equipment from the 1920s. And so, the dams could not operate. It was impractical and impossible for them to operate in instantaneous run of river. So, FERC recognized that there was some amount of play in the joints in terms of how these dams were operated. And at the time, in Article 405 of the license, FERC said that the company was going to have to, within five years, consult with the Fish and Wildlife Service and come back and explain to FERC what a proper definition of abnormal low flows would be. Or, excuse me, abnormal, I think it's abnormal events. And so, a lot of this all really stems from an understanding that this was something that the parties would have to revisit at a later date. And so, when you fast forward to 2017, when the service finally came out with their biological opinion, this was something that was contemplated all along, that the service would consult with the company. The company was the one that applied and requested that this technical assistance letter be submitted as an amendment to their license. And so, when you look at all of that, it's not a major change to the operation of this project to specify how precisely an abnormal low flow will occur. An example of a major change, to me, if the service had come back and said, you have to replace your 1920s equipment because you can't regulate flow properly through these dams, that would be a major change to the basic design of this project. But that's not at all what FERC said. Excuse me, Judge Lloyd? I'm sorry, Rogers, did you have a question? That's not me, it's somebody else talking. I don't understand why we're getting that this time. So, that argument presumes that the word action in 402.14, it's hard to know, but you know the one. Sorry, I can't figure out the exact slide. Is not the action that's analyzed in the biological opinion. Is that correct? That's your position? Your Honor, even if the, so if we assume that the FERC staff alternative is the action that the service is reviewing and that's subject to this. Biological opinion says, right? Yes, Your Honor. Okay. I'm not conceding anything. That's exactly what the biological opinion reviews. I was having trouble finding that spot, Your Honor, but regardless, I'll assume that and I still would maintain that the FERC staff alternative, if you compare the FERC staff alternative with the service's biological opinion, that's not a major change. The service didn't tell, didn't say, well, we've got the FERC staff alternative and, you know, that staff alternative allowed for generation electricity. The service continues to say that this, that generation electricity was allowed until you reach, until you hit a low flow and FERC agreed, you know, the FERC staff alternative took the same approach as the petitioners have pointed out. So what about Judge Santel's earlier question of going from pressor minus three inches to 12 feet, you know, wide, shallow, where it's been operating under the 2007 license for what, over half a century? Well, Judge Rogers, you can't go back and look at the half a century because- Well, you are with section, that's where you were. You say, look at the license. It's a federal act, but the- Your Honor, we're talking about a federal action and this dam was not licensed as a federal project until 2007. So you're looking at 2007. It still is, you know, I agree with you. You're talking about plus or minus three inches in the original license, but I would point out that there, again, article 405 in that original license contemplated further homework between the service and the company. But regardless, in terms of the 12 feet, that was, that was sort of the worst case, you know, sort of nightmare scenario. And in that scenario, you know, the service, the service's goal here was to mimic the natural river flow and to find a way to address that flow when levels, when, in a drought situation. If you were talking about 12, a 12 feet drop in these man-made reservoirs, then, you know, the service's measurement was designed to track the natural flow of the river. So you're talking about a drought then that is upstream, that is depleted the reservoirs and is leaving the mussels high and dry downstream. That's not a good service's goal to, you know, to affect the elevation of these lakes. In fact, they, we've pointed out in our brief that they're, they analyzed several, you know, followed, continued to follow this and certainly they started studying this in 2012. And they came out with their biological opinion in 2017. And in the, starting in 2014, the service started, the company started using the technical assistance letter that regulates flow based on the linear scaling model. And from 2014 to 2017, the record doesn't reflect that you have some sort of precipitous drop of, you know, 10 feet of the reservoir levels. So the concerns that the, that the petitioners are raising were not borne out after the technical assistance letter went into effect. Can I just follow up? I got, it's very important to me to understand what the action and issue in the biological opinion is. And it sounds like maybe we're, I might be citing the wrong thing or something. You have the JA. Yes, your honor. Okay. And then eight, six, seven. So your, your honor, I apologize. I'm looking at volume four of the joint appendix, just because that's where the service's record is. I can pull up the, the, this is the, you're pulling up from volume three of the, of the. Joint appendix is what I'm talking about. Yes, your honor. Well, your honor, there was a dispute over the record. And so we, we included our part of the record. I get that. I'm talking about the joint appendix, not your, not your record. And that's a transmission letter for the biological opinion, which talks about reviewing the staff alternative. And then maybe more importantly, on page JA 873, the heading is biological opinion. And it says description of proposed action, the first staff alternative. And all I'm trying to understand is I had thought that action that the biological opinion is analyzing is the same action referred in your, referred to in your regulations. When you're assessing a reasonable and prudent measure, that action is the one that the biological opinion is analyzing. Your honor, I agree. I will agree with that. No, your honor, I would agree. Well, so then it would seem like you'd have to admit that the Fish and Wildlife Service misstepped here when it compared, they said it was minor because they compared it to what, in your brief, you said the, the company, the dam company NCPIS had asked for and sort of what the technical assistant letter did or what the status quo is. So that was just an error. That's not the services there, your honor. That's mine. So I, but I, what I would say is. Well, I think it's, I think it's also in the services. Now I'm on JA 916. Right. So that, you're right, that was in your brief, but here they say minimal effects to overall operations of the facility, which again seems to be referring to sort of status quo operations of NCPIS. It certainly had more than a minimal effect on the FERC alternatives. It rejected, I mean, the prudent measure, the reasonable and prudent measure here is just rejecting the FERC alternative. Right. You found no jeopardy, but then as a, but you did find incidental take and for incidental take you said you can't do the FERC alternative, you have to do the minors. So the FERC alternative more or less tracked with, I don't think it was materially different from the 2007 license. It left the lake level test in place. That was the, that was the FERC staff's position all along. So if we're talking to, I mean, they're. Now your reasonable prudent measure is taking that away. That's correct, your honor. That's the point. So then this is still, it doesn't change the basic design scope or duration of this project. This is still a hydropower. As compared to FERC proposal. Yes. Okay. Just to make sure my understanding was that part of the basic design and proposal was maintaining the lakes within the. Well, your honor, now you're referring back to the 2007 license and I would maintain that again, article 405 of that original license contemplated that this would happen. When the service studied this matter in 2007, when the license was first put in place, it did not have a lot of data on the river flow on how these dams were going to affect. This wasn't a federal project before 2007, but there's a placeholder that the commission put in place in the 2007 license in article 405 that said, you're going to need to look at this again. I know. And that's what NCPIS came in here. That's exactly what's going on here. And so it seems to me again, that the action that's being analyzed has got to be whether as compared, and FERC said, we will thank you NCPIS for coming forward, for following up as required. And here is our, here's what we will license. And that license did not allow the significant lowering of the rivers. And then Fish and Wildlife said, wait a minute, wait a minute. And FERC too, we got to look at the effect on these species here. And that's when you all come in and what you're analyzing is not the original license. You're analyzing whether the proposed agency action, which is FERC's staff alternative, whether that proposed agency action would jeopardize the species. You said no, but there'll be incidental take. So as for that staff alternative action, we can only make minor changes. But you made the big one that you've all been fighting about, is what are we can control, what happens to the lakes? Your Honor, so I agree with that. I think our point is that we would maintain, so the service by regulation is not permitted to make major changes to a project. The service when it does doesn't come in and say, you know, there's going to be take, therefore you need to change your project. What the service does is say- Exactly what you did here. Isn't that exactly what what service need here? You said there's going to be take, so you're going to have to make these changes. The changes are not minor or not major, Your Honor. That's our position. These are not, this is not a major change to the to the federal action. A 12-foot depth variation on a broad and shallow midwestern lake is not a major change? Your Honor, that was a hypothetical that the FERC staff came up with. That's not, there is no record evidence showing that the service's reasonable prune measure has resulted in a 12-foot drop. You said on the record it showed, what was the biggest drop that happened on the record? I know there's been problems since then, at least according to Ms. Romaine, but on the record before us, do we know how much of a drop there was, the biggest drop? Your Honor, I have to, so in our brief on page 44, we address this and say that the service is looking at the actual data that had come out from a six, for instance, a six-day low flow period in October 2015, and the lake did remain in their design level of plus or minus three inches. But it could have made as much difference as the 12 feet proposed in the hypothetical, couldn't it? The wildlife services revision could result in that change during drought period, didn't it? Well, Your Honor, that's exactly right, but I guess, I mean, if the tip of canoe dries up... If that's right, that's the baseline we've got to look at and decide whether this is a major or minor change, isn't it? I don't think the extreme scenario, I don't think the FERC staff's extreme calculation of what could happen, theoretically, is the basis for that. And I also would point out, Your Honor, that if the tip of canoe in a drought dries up, then the lakes are going to drop 12, you know, they will continue to drop at some point. So your point is that that 12 foot thing was simply sort of a sort of fantastical... It was a forecast of a worst-case scenario, but it also... Did they make a forecast of how likely that worst-case scenario would be? Did they say this will never happen or this couldn't happen? It's a little hard for us to understand how worst-case... Worst cases happen, right? Or there are worst cases that never happen, and it's hard to know which one this was. Your Honor, I also... I agree. I agree. Hydrologists give a testimony that didn't involve a worst-case scenario in any context. Hydrology expert witness, have you ever heard of one that did not include the worst-case scenario as part of the consideration? That certainly should be a factor, Your Honor. So, but I would back up too and say, I mean, in some ways, so the commission's position has been that the dam should be operated to reflect run-of-river. And I think one of the things that the service has done definitively in the record is established that it was not in fact being run in some sort of instantaneous run-of-river. The dams do affect the flow of Pacific Canoe. And when they're held to within a six-inch margin, of course, there are downstream impacts. That's not, you know, that is... There is a very large body of evidence that the service put forward that establishes that. So the question is not, you know, the service has a very solid record to show that the dams are being operated in a manner that results in take to mussels downstream. And the question is what to be done about that. And, you know, FERC staff may have put forward a position that basically mimics the 2007 license, but that will leave FERC and the company liable for Endangered Species Act take if they were to maintain that position. So one of the arguments that there were takes elsewhere as well that FERC ignored, so you didn't have a control. And here, I think your brief refers to there was a field study in what, 2013? Your Honor, I think you're referring to the petitioner's argument that relates to the Indiana study from 2012. Is that... Could be. I'm referring to the field study. Yep. Your Honor, the petitioners argue that, you know, so the field study that Indiana did, this was during a bad drought in 2012. This is what alerted everyone that there was a problem. Indiana did a field study and found take of endangered mussels, death of dead mussels, endangered mussels downstream. And the petitioners now argue, well, look, you didn't study, you didn't look upstream and sample mussels above the dam to see if there were dead mussels, endangered mussels upstream. And therefore, how do you know that these dams were in fact influencing the flow of the river? So the answer to that is that we know that the dams are influencing the flow of the river because of all the other research and study that the services did. But on this specific point, Judge Millett alluded to this, that the petitioners didn't raise this in their rehearing argument. So we don't think that they jurisdictionally make this argument today. In their rehearing argument before FERC. That's correct, Your Honor. All right. So City of Tacoma, it seems to me, suggests that they probably can raise it before this court in this proceeding. Well, then I would also point out that they haven't raised, they never gave the service an opportunity to even consider that argument. So I can't... But they did to the extent their experts raised it. Your Honor, I believe that that argument when they're talking about... One of them. I believe that refers to... I want to confirm, but I believe that refers to a supplemental expert report that they submitted. Well, I was going over them yesterday and one of them, Dr. Chris or Dr. Engel, made that argument. In other words, nobody was hiding the ball here from the agency. That's all I'm getting at. And on the City of Tacoma, I don't read it to say that they should probably raise these before FERC. Well, Your Honor, I want to address the critical point here, which is that the service did not have an opportunity to address this because the report that they're referring to is Dr. Engel. I wanted to give the record site, but it's an October 2017 report. The biological opinion is from July 2017. So this is an after-the-fact attack on the service's biological opinion. And what's wrong with that? Because the service didn't have an opportunity to respond to that argument. Service's final action here. What did they do? So what should they have done? Should they have gone to the Fish and Wildlife Service and filed some new proceedings when our court has said they can raise their objections in the proceeding that we're in now? Well, Your Honor, so there was a lot of back and forth here. So the service and the petitioners traded blows throughout this proceeding. And if this was something that the petitioners thought was going to materially change the results here, then they could have raised that earlier. So your position would be, I guess, that they either have to somehow raise it to the service or raise it to FERC so that FERC will know why it's unreasonable to rely on this service, and they didn't either here. Your Honor, almost. I do think that their expert report raises the issue. And I don't know how that the timing of that relates to the rehearing request, but their rehearing request didn't raise the issue. Well, the rehearing, we don't say, yes, it's not in the rehearing request. Correct, Your Honor. But I would point out, so this is the one piece of evidence that the petitioners are referring to as, well, what about this, right? They won't engage with the service on all the evidence that the service relied on. But they do certainly engage, and they did before the service, challenging what the service was looking at, and that you were looking at something that involved polar bears, not river flow. Okay. So, Your Honor, I guess I would start. So, my point was as to take conclusion. The service had a lot of evidence that supports its take, its conclusion that the dam's operation was causing take downstream. And the petitioners really have not engaged with that evidence that the service presented. As to, I believe you're referring to the linear scaling model. Is that? Yes. And that's what, I mean, FERC saw that some mussels had died. All right. And according to Fish and Wildlife Service, it never examined mussels before the 2012 drought. All right. They really didn't know what was happening. All right. That's in the record. And then Mr. Clark makes some telephone calls or emails, et cetera. And he's read about this model. And he's told it's for overflows, not low flows. And here are the problems with applying it to low flows. And FERC marches ahead. Now, FERC, not FERC, excuse me, the Fish and Wildlife Service marches ahead. It was aware of that challenge to what it was doing. That's all I'm getting at. This is not one of those situations where the first time you learn about this is in the brief they file in this court. No, Your Honor. I wasn't suggesting, so they certainly challenged, the petitioners have challenged the service's use of linear scaling. I agree with that. I was referring to the Tait conclusion. They're really, to me, using this model. Sure, Your Honor. Sure. I'm happy to speak to that. So I can unpack that in detail. But I think the things, quickly, the things that I would point to, I would start with the standard of review here. This court gives, and I'll refer the court to its Wisconsin VEPA decision last year. We've been over that, counsel. That's not the issue we're discussing now. Sure. We've been over it a few times, all right? Yes, Your Honor. Okay. So let me talk about- Pack it. Yes, Your Honor. So let me talk about the evidence here. So the service had several studies from Professor Galster that sketched out, that laid out this idea of linear scaling. Those are Joint Appendix 1037 to 1052. And he did research on overflows and said applying it to low flows was problematic. So that's number one. So, Your Honor, Professor Galster did not say that applying low flows to, applying the linear scaling model to low flows was problematic. Well, it's not there in the record. I didn't refer it. So, Your Honor, I would refer the court to two things on that point. Joint Appendix 1080, that's a record of the services conversation with Professor Galster. I'll pull that up because I think that that's an important piece of evidence here. So I'll pull it up and quickly- That's what we're talking about here. That's what's so disturbing about this, candidly. I'm sorry, 1080. Did I say 11? I may have said 11. J1080. So, third paragraph, Your Honor, this is the service summarizing its conversation with, services biologist summarizing his conversation with Professor Galster. He, Professor Galster, also said that a linear scale is more likely to be correct during low because high flows have inherent confounding factors like different and high levels of precipitation or snowmelt across the watershed. This is Mr. Clark. Yes, Your Honor. Right? Yes, Your Honor. All right. Well, earlier, we got Professor Galster and Mr. Clark, and they do talk about this is problematic because all the research he did was overflows and you have all of these geological interferences. So you're not going to get a linear take. I mean, you're just saying fish and wildlife never knew that. No, Your Honor, I didn't. I wasn't saying that. Your Honor, this is between the service biologist and Professor Galster. I'm not sure. So the petitioners have cited to a later conversation or some email exchanges like five years later that they had between Professor Galster and I think somebody, maybe a lake owner or somebody, and they tried to question and undermine whether the service had a valid conversation with Professor Galster years before. I'm happy to address that. Do we have Professor Galster on record supporting what you say Mr. Clark said, Dr. Galster? Your Honor, if this were a civil trial, then I would call Professor Galster, and I would call the service employee, and I would cross-examine them on this. If it's not an argument, you would give me a yes or no answer. No, Your Honor, I'm not saying directly from Professor Galster. Or do you just have what Clark says, Galster? Your Honor, I have what Mr. Clark said. The contemporaneous record of what he, his conversation, correct? That's correct, and I'll point the court to his Defenders of Wildlife decision from 2016 in which it said State Farm, the agency action is presumed to be valid. And here, I think the agency's employees are, you know, presumed to be acting in good faith and to be, you know, doing the best that they can to solve a problem. Has the petitioner, did they introduce evidence showing that this is a false record of his conversation? They didn't have this conversation, or he didn't record his impressions accurately? What, Your Honor, what I would say about that is, so, I would say yes, Your Honor, that that is the, that that is what they are trying to say. And what, what I would say in response, that's in the reply brief. I'm happy to pull up the- Well, this is a civil action or an administrative proceeding. We had not been in the better practice to get something directly from the professor rather than to simply have had somebody's recollection of what the professor said. I would agree, Your Honor. The service, the record reflects that the service's biologists investigated this. They asked questions. They tried to do the best job that they could. If they had hired Professor Goldster- Rather than a biological point. Excuse me? A hydrological point rather than a biological point. Well, Your Honor, so, on that point, the biologists here are not hydrologists. That's very clear. Yes, I agree with that. Did you consult, did they consult with hydrologists? They consulted with hydrologists. And I think if you look at the Court City of Tacoma decision, that makes clear that the, that Congress has delegated the task of, you know, making these sorts of judgments and reviewing the evidence and exercising its expertise to the service. Where is the record, where does the record show with whom the service consulted? Who was- Which hydrologist. Hydrologist. And who was it? And at what point? What date? So, Your Honor, I would point to emails from 2013 to 2014. There's a series of emails we've included in the joint appendix. This is in Volume 4, where the service's record is. I'll give you the joint appendix sites. It's JA 1069 to 1080. 1069 to 1080? Actually, to 1079. 1080 is the discussion with Dr., with Professor Colson. 69 to 79? 69 to 79. JA 1093 to 1097. And JA 1150 to 1154. Sorry, what was the second one? The second one was 1093 to 1097. And the third is joint appendix 1150 to 1154. So, those are the three examples we included in the record, but I did want to point to one page in particular that I think is relevant here. So, the petitioners say that we had one in their opening brief. They say we had one conversation with the hydrologists, and the hydrologists disagreed with us. But if you actually look at the email exchange, it goes back and forth between the U.S. Geological Survey hydrologists and the Forest Clark, the services biologists. And I wanted to call out one point in particular. On JA 1074, the USGS hydrologist, Don Arvin, Donald Arvin, in the third paragraph says, although I don't have an exponent or coefficient to offer, your methodology seems on target. So, that's the point petitioners make. You take that language and treat it as an endorsement when there's other language indicating concerns about applying high flow models to low flow. And even in the sentence you just read, there's a qualification to what he's saying before the nonetheless, you don't have A and B. Right. So, the service acknowledged that there were a number of uncertainties. They were trying to find the best available science here. The petitioners and FERC more or less put forward only one alternative, and that is a lake level test. And the service very conclusively had found that that was not going to mimic the typical use natural flow. So, the service was trying to find the best available way of estimating the flow here. I would point to a few other things that I think are really important about the linear scaling model here. One is the service validated its linear scaling model with real world data. This is important. And there's two pages of the joint appendix that, on behalf of the service, I would encourage the court to review. It's joint takes the low river flow data for 14 and a half years, involving 600 days of low flows, and compares that to the linear scaling model that it felt was the best available science. And that low flow data confirmed to the service that the model was accurate. And this is the court's Appalachian Power Company decision from 1998, says that a model has to relate to real data. And that's what the service did here. Now, the petitioner's only response is to point to the 2010 data and say, well, you juked the numbers here because you pulled that data out. I have a couple of responses to that. The first response is that the data was only pulled as to the maximum and minimum error bars there. The maximum and minimum errors. And the maximum error when the 2010 data was included is 44.1%, which sounds really high. But of course, that's the maximum error. When you take out the 2010 data, then the maximum error drops to a 23% error and a minimum error is 20.4%. But much more relevant than all of this is that the average error between the flow coming from the gauge, the Winnemac gauge, and the actual linear scaling prediction was only 0.4%. 0.4%. And the upper and lower quartile errors are 2.6 and minus 7.1%. So I'm not a mathematician, but it seems to me that this is a very reasonable way for the model. All right. Why don't we hear from Petitioner's Council? Thank you, Council. Thank you, Your Honor. Council for Petitioners, give you a couple of minutes here. All right. Now I believe I'm unmuted. You are. Thank you. I want to respond first to the idea that other than putting it in a supplemental expert report, we never gave the service notice and they had no opportunity to respond to the lack of scientific rigor involved in not looking at simultaneous upstream muscle deaths. And it has nothing to do with the 2013 study because we're talking about 2012. At the same time, there were dead endangered muscles, nine of them, downstream from the dam. There were, I don't know how many, but many is the word used by IDNR, dead muscles upstream of everything, including not endangered but threatened rabbit's foot muscles. And that is, you know, and the question we've posed from that is how can they tell that it's the lake and dam that's causing the death downstream if way above the lake and dam, the same thing is happening to muscles? And they've never tried to answer that question. That's not fair. That's the chart that I pointed out to you. They did an extensive study that showed you can't just look at it that way because the dams themselves, even without generating electricity, make a substantial difference in downflow. So it's not, I don't think it's fair of you to say that they haven't even tried to answer it. I think they've answered it. And you weren't even aware of it or aware that it involved no electricity generation. Your Honor, I may have misspoken and therefore been misunderstood. What I'm talking about is they never examined why the muscles upstream were dying at the same time. They just assumed. Now they later did all kinds of studies, but they never once questioned what is it that's going on that causes muscles upstream and downstream to die at the same time in a drought. Never. They never did that. And so that was in the supplemental expert report. And he said, well, that came late in the game. It came in October 3rd, I believe, October of 2017. Well, after the biological opinion was issued. And you didn't present this either in your re-hearing. As we pointed out in our brief, initial brief at page 36. And December 13, 2017, five months after transmittal of the biological opinion, the Forest Service claimed that someone with hydrological expertise had been involved. That's first time they did. And it was a December 13 letter to FERC. It appears at Joint Appendix 965 to 968. It was written in response to the protest coalition's October 3, 2017 letter and supplemental reports critical of the biological opinion. It says that's what it's written in response to. So they had every chance to respond. And they said that they said for the first time that they had engaged an experienced hydrologist working in the Midwest Region Office of the National Wildlife Refuge System to review our work, particularly with respect to the criticism of Chris and Angle, and to evaluate the hydrologic component of their conclusions. Well, they did respond. They responded in five page. They gave the observations of this after the fact hydrologist they got involved. But not once did he mention the words linear scaling. And not once did he address this question about how can you tell if upstream and downstream mussels are dying at the same time from the same drought that only the downstream ones are being killed by the dam. So they had their opportunity. One other thing, because it's something that you and Judge Rogers both spoke to, and that is eliminating incidental take. Judge Rogers, you asked Ms. Rylander that all we're talking about is what drawdown is necessary to eliminate incidental take. And Judge Millett, you asked a question about we got a non-Jeopardy opinion, but we still got to look at incidental take. So I want to repeat the argument that we have made, an argument to which they did not respond, they being Fish and Wildlife Service, that the only thing supporting their finding that would occur or was likely to occur if the staff alternative were put into place, the only thing that supports the issuance of an incidental take statement is their flawed linear scaling calculations. Because it is based on levels of flow downstream from the dam that are in turn based on levels of flow upstream from the other dam that are based in turn on linear scaling that has nothing to do with low flows. So there shouldn't even, and we've argued this, we've argued it during the proceeding, we've argued it, there should not have been an incidental take statement. There shouldn't be a reasonable and prudent measure, and certainly not one that makes major changes. And with that, I'll stop unless the court has questions for me. Any questions? Thank you, counsel. We will take the case under advisement.
judges: Rogers, Millett, Sentelle